The next case is Salix Pharmaceuticals and Dr. Falk, Pharma v. Mylan, 2017-26-36, 2018-13-20. Ms. Falk again, this is non-infringement, the other was validity. Correct. May it please the court, the district court erred in construing the claim terms, two claim terms, granulated misalamine formulation, and the 85-90% of the misalamine reaches the terminal ileum and column. This erroneous construction led the court to improperly find that Mylan's antiproduct did not infringe the asserted claims of the 688 patent. I'd like to start with the granulated misalamine formulation issue first. With respect to the granulated misalamine formulation, the court adopted a construction that is contrary to the teachings of the intrinsic evidence. Well, granulated is all over the patent. It is in connection with granulated misalamine formulation. It is never used independent of the phrase granulated misalamine formulation or granulated misalamine. It is also used interchangeably with the term misalamine granules. And I can point the court to figures one and two of the patent where they talk about it as misalamine granules. And in the text where those figures are referred to, they talk about it as granulated misalamine. It is used interchangeably. It is also used interchangeably with the term pellets. Is there no question that Mylan doesn't use a granulated formulation? There's no dispute that Mylan does not use a granulation process. That's correct, Your Honor. But it's also undisputed that granules, and their expert admitted this, granules do not require a granulation process. And so if these terms are used interchangeably. Where do granules come from if they're not through a granulation process? You can make them through, and this is, you can see this in the 620 patent, which is incorporated by reference. There are all sorts of conventional processes that they talk about, spherinization and other processes. I can't name them all off the top of my head. But if you go to the 620 patent, which is for controlled release pellet formulation, despite the fact that the examples are all granulation, it specifically states. That doesn't say granulation, does it? What? The 620 patent? It does not. It's only in the examples. It's just the example showing the method of manufacturing, the claimed novel controlled release pellet formulation. And the patent expressly states that the novel pellet formulation can be made by conventional processes. And that's in column four of the 620 patent. But it doesn't mention granulation, does it? Not in the claims. It's only in the examples it describes a granulation process. Where in the specification is there a granulation process? Let's be clear. Let's be clear. Let's talk about the 688 patent. It's the patent that issued here. 620. You're referring to 620. The 620 refers to the granulation process in the examples. Where? It doesn't use the term granulated, but the process that's described there is a granulation process. I don't dispute that. Okay? So let's be clear, though. In the 688 patent, there is no, says nothing about a granulation process. None of the examples are a granulation process because it's not surprising. It's a method of treatment patent. And so these are clinical studies. How about the 85 to 90 percent? Doesn't Mylan have 95 percent? They have 94 percent, correct? Okay. Beyond 90. Well beyond 90. Well, it's our position that the 85 to 90 is a lower limit of the release of the drug. It is not an express range with a floor and a ceiling. In fact, it would be contrary to the understanding of a person of ordinary skill in the art to put a ceiling on misaligned delivery. That was the consistent testimony of both of our experts, unrebutted. Then why did the patent drafter do it? The patent drafter did it. It's an express range. We don't dispute that. There are no words of approximation. But it's a range for the lower limit because of the inherent variability, inter- and intra-individual variability. It doesn't even say about. It does not say about. In and of itself is a qualifying term because it's a range. And elsewhere in the claim, the words at least appear with respect to six months. So obviously they didn't intend that to appeal with 85 to 90 percent. I'm not asking for, we're not asking for there to be qualifying language in the claim. We're saying the range itself is qualifying for the lower limit. It is a range. But it is not a range that you target for delivery. It would be, the testimony of record is that it would be impossible to target such a narrow range to have the delivery of the misalignment there. And that is, that's evident from just the coefficient of variations in the tablets. If you look at table one and tables three and four. I'm not surprised that this claim has all sorts of limitations in it because there's column after column of prior art references. And so this is a very crowded out. They had to put a lot of stuff in these claims to get it allowed. That may be, but that doesn't change the fact of what we're arguing here, Your Honor. So let's turn to the 85 to 90 percent. I would go back to the fact that I said that the court erred with the construction of that term. The court dismissed the extrinsic evidence, relied on the claim language itself. And that was error because where she went off the rails a little bit was she had a fundamental misunderstanding of the objective of the invention and misaligning formulations in general. Because she did not, and she says this in, the court says this in her opinion, and this is in appendix 61 to 62. That the claim method is of a decidedly different character than simply getting as much misalignment to the terminal ileum and colon as possible. And never suggests that the claim method's objective is to deliver as much misalignment to the terminal ileum and colon. And that fundamental misunderstanding derailed her and got her to, led her to an erroneous claim construction, led her to erroneously dismiss the substantial extrinsic evidence that was submitted, where it was all consistent, all unrebutted, that the objective of these misaligning formulations, and this is also in the intrinsic evidence at column 27 and column 9, the objective is to maximize the delivery to the colon. And that there was significant testimony that said that you would never put a ceiling on delivery of misalignment, that you would never have a floor and a ceiling. And the other thing I would say is that the two references in the specification that give that 85, that talk about the release profile, and this is at column 9, which talks about the release profile being 85 to 90 percent. And then in example 4, it talks about approximately 80 percent. It would be inconsistent to put a ceiling on the delivery, given those two teachings in the intrinsic evidence. And that's why you need to go to the extrinsic evidence, which is not inconsistent at all with the construction that we propose. Of course, if the claim is said very high, then you might look to the specification. But here it says very specific, as you can see, very specific range, and therefore a number outside that range doesn't necessarily construe, or isn't necessarily inconsistent with the precise range which is in the claims. It doesn't say very high, and that's why they don't put an upper limit on it, because if I put in very high, I'd be right back here at the court, and you would be asking me, what does very high mean? Well, then we'd look at the specification. This is true. This is true. So even if you were to construe it as an express range, with a floor and a ceiling, which we believe is inconsistent with the understanding of how a person of ordinary skill in the art would view this, particularly in light of the objective, generalized objective of misaligning formulations, of getting the maximum amount to the colon, right? Even if you construed it as a strict range, which we believe to be error, we still have an argument under the doctrine of equivalence, that we set a lower limit of 85 to 90, and if you've got 85 to 90 there, you're going to maintain remission. So if you've got 94 percent there, you're going to maintain remission. You don't think a number outside the range vitiates the claim limitation that gives a precise range? I do not, for the reasons that are set forth in the Abbott versus Day case that we cite in our briefs. I believe that's the name of the case. Where it says expressly, this was a very similar situation where they had an express range, and they had testimony, just like we have here, that it's not insubstantially different if you have more than that express range. And that's the evidence that we have here. If you're maintaining remission, you're maintaining remission. And if you get the vast majority there, which is what our expert Dr. Safdie says, you're going to maintain remission. I am getting close to my time. I think I'm going to save the rest of my time for my rebuttal. We will save it for you. Mr. Florence. Thank you, Your Honors. I would like to start with the court's construction of the granulated misalamine formulation. The court properly looked at the claim and noted that the word granulated in the claim itself modifies the term misalamine formulation, and that it also modifies the term misalamine. Because what the claim actually says is that the purported invention is practiced by administering to the subject a granulated misalamine formulation, comprising four capsules, each comprising of granulated misalamine. And as Your Honor pointed out, the word granulated is all over the specification. It's literally used hundreds of times. Hundreds of times. Well, what about the reference to the 620 patent, which talks about pellets? Sure, absolutely. We can talk about that. The 620 patent does talk about pellets, but the 620 patent is incorporated by reference in a section of the 608 patent entitled Granulated Misalamine Formulations. And then it says methods for making misalamine formulations are contained in the following references. And it cites the 620 patent and two other references that essentially have the same disclosures because they're all continuations of one another. And so what the focus on at the trial was the 620 patent and what it showed. And Ms. Bork pointed out correctly that the 620 patent in and of itself does disclose pellets just in general. Specifically, it discloses pellet formulations where they have a matrix core and then they're covered with an enteric coating as well. But what the court found was that granulated misalamine formulation, that term in itself, granulated, is a term of art in the pharmaceutical arts. What does granulated mean? When a person of ordinary skill in the art reads the 608 patent, which uses granulated hundreds of times versus the 620 patent that doesn't use it at all, what does it mean? Because the 608 patent doesn't provide anything beyond the incorporated 620 patent on ways to actually make granulated misalamine formulations. But what the 620 patent does show, if you look at the working examples, those are the only actual examples that show how you make such a formulation. As Ms. Bork acknowledged, and as both formulation experts, Dr. Ostlander and Dr. Davies, testified, those examples are made using wet granulation. Now, Dr. Davies argued on behalf of the plaintiffs that he believes that because it was incorporated by reference that the 620 patent is a form of art. And that the 620 patent covers any pellet formulation. But the court said, well, that may be true, but incorporating the 620 patent by reference and arguing that you get the benefit of every conventional way of making a pellet from that patent is belayed by the disclosure of the 688 patent itself, which literally hundreds of times doesn't refer solely to pellet formulations. It talks about granulated misalamine formulations. And the reference to the 620 patent talks about misalamine formulations, not granulated misalamine formulations. That's correct. And as your Honor pointed out, and as Ms. Bork acknowledged, the term granulated isn't even used in the 620 patent. That's true, but it is used hundreds of times in the 608 patent. It's not mentioned by the granulated misalamine formulation or the misalamine itself. What the patent does, there are places where it doesn't talk about granulated misalamine formulations. But every time it mentions misalamine formulations by themselves is either to talk about other prior art formulations in general for misalamine, or to compare a granulated misalamine formulation with a non-granulated misalamine formulation. Now, but something that's important that hasn't been touched on is the court looked at and weighed the credibility of all the experts that were opining on this issue. And Ms. Bork pointed out that there are places where the 688 patent uses the terms pellet and granule interchangeably with granulated misalamine formulations. Now, it would so to seem that that's what happens, but that was from the perspective of Dr. Softe, who isn't a formulator. He's a practicing physician, and the court noted that given that a POSA is presumed to review the claim terms in light of the specification when determining what granulated means, the plaintiffs had not demonstrated that Dr. Softe, although he was an accomplished gastrointestinal clinician, qualifies as a POSA with regard to the pharmaceutical formulation at issue. So he saw it as just under a more layman view of what a physician sees when they see the word granulation. He testified, well, to me, it's just small particles, pellets, granules, any small particle. But the court gave him some credit for that, and she did give his opinion some weight by noting that the interchangeable nature of the word, such as granulated and granule and pellet, in his professional vocabulary, shed some light on the 688 patent's oscillation between misalamine granules and granulated misalamine formulation. And that was in appendix at 51, but the court went on to say that, however, such interchangeability fails to clarify the specification's reference to pellets of the granulated misalamine formulation, which under Dr. Softe's flawed interpretation would redundantly read as granules of the granulated misalamine formulation, which is akin to saying the 688 patent stating granules of the granules misalamine formulation. What about the 85 to 90 percent claim limitation when the patent also talks about an 80 percent formulation? Sure. When the patent does talk, there are two places in the patent specification that relate to percentages of the misalamine that's either available or delivered to the target area. And what the court said about those, looked at those two portions of the specification and found that, although a POSA might understand the 85 to 90 percent limitation to represent a minimum threshold of misalamine delivery, the limitation is expressed as a closed range in claim one and, at best, an approximation in the specification. So if you look at the specification itself, example four is where the approximately 80 percent comes from, and that's in column 17. And essentially it states that approximately 80 percent of an administered oral dose of misalamine is estimated to be available in the colon, sigmoid, and rectum when dosed as misalamine granules. So obviously the patentee knew how to use words, varying terms such as approximation. We already saw that they knew how to use the term at least because they use it as it relates to the timeframe for remission in claim one. But they didn't use those terms in the claim. That's not what they claimed. The claim doesn't say anything about approximately 85 to 90 percent, and it certainly doesn't say approximately 80 percent. It just flat out doesn't say that. But if you look at the other part of the specification that does mention the 85 to 90 percent, and this is in column 19, lines 50 through 54, it has identical language with the claim. It says the release profile and additional pharmacokinetic data show that the pellets of the granulated misalamine formulation have a relatively low rate and extent of systemic absorption and that 85 percent to 90 percent of drug reaches the diseased area. So it uses the exact same closed range that's in the claim. And you say this was in column 19? Yes. Lines 50 to 54. And so the specification really just supports essentially the construction that the district court came up with. But really what's going on here is the plaintiffs want to use just extrinsic evidence to come in and trump, extrinsic evidence to trump what the intrinsic evidence actually teaches. And yes, we agree that their experts all testified that a person of ordinary skill in the art outside of the patent wouldn't use an express range for delivery of misalignments. Tell me again where in column 19 of the 688 patent at lines 50 to 54 is the range. I don't see that. I'm sorry. I may have pointed you to the wrong spot. I'm sorry. It's column 9. It's column 9, Your Honor. My apologies. Column line lines 50 to 54. Considering the extrinsic evidence, what the district court found was that said the contentions of Dr. Softy, Dr. Golden, and Dr. Johnson must be rejected as inconsistent with the plain language of the limitation. As well as the disclosure of the specification. None of the posited testimony established that closed ranges such as the 85 to 90% limitation are regularly used as lower limits in the relevant art or that they have that special meaning. Rather, the testimony the court found was but an extension of the plaintiff's argument that the 85 to 90% limitation should be construed to mean at least 85 or 85 to 100% rather than the plain language of the claim itself. So you're saying if the specification has two conflicting numbers or sets of numbers and the patentee decided to claim one but not the other, that's what the claim means? Yeah. Essentially, that's what they claimed. In the specification, there are two disclosures regarding percentages. And they went with the 85 to 90% closed range. That's what they claimed. They definitely could have claimed something different, but they didn't do that. They didn't use the term at least. Obviously, they knew how to do that. In that event, Mylan doesn't have the 80. It has, what, 95? Well, Mylan disputes that the evidence put forth by Dr. Golden, that that evidence that you can actually tell how much of the percentage of the drug actually reached the targeted area because that data was based on an extrapolation of bioequivalent studies from Mylan's ANDA itself. And Dr. Golden admitted that the plasma profiles, the information that was found in the plasma profiles, how much mesalamine was absorbed, that it doesn't tell her, it doesn't tell you where in the GI tract it was actually absorbed. Instead, she was relying on the FDA's allowance for showing bioequivalence as a surrogate, that if you do get systemic absorption, it's assuming that it was absorbed in that area. But it's just a surrogate. She admitted that you can't tell that based on blood plasma concentrations alone. And so we dispute that it actually shows that. And she certainly didn't look to see whether or not any individuals... So Mylan has an ANDA which matches the blood levels of the reference product, but has a different result in terms of the patent infringement question. Yeah, it is a different result, but I wouldn't characterize it as it matching. We feel that we've shown bioequivalence, that it's bioequivalent, but showing bioequivalence, you get a little bit of leeway for the area under the curve. There's an 80 to 100 percent variation that you can have. It doesn't match it exactly. But our position is that those blood levels alone can't show that. But the court didn't really get the goal wrong either. What they point to in the specification for the goal of delivering as much mesalamine to the colon as possible, that section is actually talking about all mesalamine formulations, pre-existing formulations, this formulation. The patent itself states in column one that the goal of treatment in ulcerative colitis, this is at line 49, is to induce and maintain remission and improve quality of life. And that's what this claim is directed to. Sure, it might be true that more is better, and if you do get more to the target area, you might be able to improve the quality of life, you might be able to maintain remission better, but that's not the specific goal. Was there relevant prosecution, I guess if there had been we would have heard about it, relating to the 85 to 90 percent in the prosecution of the patent? Well, it was added to overcome the Salix press release. The Salix press release doesn't have any information in it regarding the percentages of mesalamine that's delivered. And it was added, and in the prosecution it states it was added to show... It was added to show how the drug is distributed, that the drug is distributed in this manner. But there's no explanation in the prosecution history that it's not a closed range either. And one last point I'd like to make, there is evidence in the record that the commercial embodiment of Prezo is in fact covered by the strict range. And this is at the appendix at 3856. This is the testimony of Dr. Johnson who calculated the 85 to 90 percent in the patent itself. And he stated that the lowest level for a single patient was 86.6 percent. So I know they argued in their briefs that the commercial embodiment would be excluded if it's a closed range. It's not. There's evidence that certain patients do fall within it. You might have some variability that some fall without, but this isn't a situation where they've claimed something that they can't even practice. Thank you, counsel. Ms. Bork has some rebuttal time. Let's just start with the granulated miscellany formulation first. There is an argument that has been made that for some reason the 688 patent is narrower than the 620 patent. Because when the 688 patent refers to the 620 patent incorporates by reference, it just says miscellany formulations. That's not true. What is disclosed in the 620 patent are both granulated miscellany formulations, these small controlled release pellets, as well as miscellany formulations, non-granulated miscellany formulations, which are the tablets, the prior art cellophile tablets. It's also true for the 688 patent. The 680 patent does not disclose granulated miscellany formulations from non-granulated miscellany formulations. If you look at those passages, they're talking about treatment failure, and the treatment failure was with the tablet acycol. They're distinguishing the non-granulated miscellany formulations from the granulated miscellany formulations in terms of the tablets versus the small pellets, beads, granules. Remember, this is a patent that's a clinical patent. It's directed to methods of treatment. The one complete error that the district court made was when it went to look at the extrinsic evidence in Dr. Safdie, and he was mentioned earlier, what the district court did in discounting Dr. Safdie's testimony and discrediting it, was to look at the evidence. What the district court did in discounting Dr. Safdie's testimony and giving it little weight was because he didn't go look at Myelin's ANDA product and process. We all know from this court's precedent that's completely contrary to the claim construction process, which should be based on the intrinsic evidence, not on the accused product. And that infected her analysis of the two other experts, the formulators, where she credits Dr. Auslander over Dr. Safdie. Or Dr. Davies, because she says, well, Dr. Auslander said that you had to go look at Myelin ANDA manufacturing process. We all know that's not what claim construction is about. Let's also put all of this into perspective. When we went to trial, neither of these terms were given a construction at Markman. The parties all agreed that it was plain and ordinary meaning for both of those terms. So that's how the testimony came in. These experts were not doing a quote-unquote claim construction. The claim construction was done later by the district court in the post-trial opinion. And so for the 6A8 patent, what matters is not the manufacturing process. It's the distinction between the big monolithic tablets that have the problem with the dose dumping, that as opposed to the multi-particulate systems, the small pellets, beads, granules, terms used interchangeably throughout the specification, because it's written in terms of a clinician, or at least people looking at methods of treatment. And so that's what the distinction is. They're not looking at the manufacturing process. A couple of things on the 85 to 90. All I would say is that in terms of Dr. Golden's infringement analysis, that was never challenged in the district court. They should have filed a Daubert motion in terms of reliability of the methods that she was using. That was never done, so that's been waived. And all I would say is that with the 85 to 90, when the intrinsic evidence is ambiguous, as it was to the district court, you must resort to the extrinsic evidence to understand how a person of ordinary skill in the art understood that range. And with that, my time is up.